# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4572 | **DATE** | June 26, 2002 |
| **CASE TITLE** | US ex rel Eloy Simental v James A. Chrans, Warden | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]

## Memorandum opinion and order entered.

## Accordingly, the court denies the petition for writ of habeas corpus.

(11) ☎ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| X | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUL - 1 2002 | |
| | Docketing to mail notices. | date docketed | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| GDS | courtroom deputy's initials | date mailed notice | |
| | | mailing deputy initials | |

Document Number

22

U.S. DISTRICT COURT
CLERK
02 JUN 28 AM 11:30

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

JUL - 1 2002

UNITED STATES OF AMERICA, ex rel. )
ELOY SIMENTAL, )
)
Petitioner, )
)                    No.    99 C 4872
)
v. )
)                    Judge Robert W. Gettleman
JAMES A. CHRANS, Warden, )
)
Respondent. )

## MEMORANDUM OPINION AND ORDER

In 1992, petitioner Eloy Simental was convicted by a Illinois state jury of first degree

murder and sentenced to 60 years in prison.  After an unsuccessful direct appeal and post-

conviction petition, Simental filed a pro se petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, asserting seven grounds for possible relief.   Respondent answered the petition,

discerning only five cognizable grounds.  The court then appointed counsel for petitioner, who

filed an amendment to the pro se petition, elaborating on petitioner's arguments for three of his

claimed grounds.  Respondent filed a second answer thereafter, addressing those three grounds

only.  Finding the four claims raised in petitioner's pro se petition but not addressed by his

appointed counsel to be either repetitive or without merit,[1] the court addresses only petitioner's

---

[1] One such ground was a claim of ineffective assistance of post-conviction counsel based
on counsel's failure to raise a claim that was raised and addressed on direct appeal and therefore
preserved for this court's review (negating any possibility of prejudice to petitioner).  Petitioner's
other three grounds assert that the Illinois Appellate Court deprived petitioner of "a fair appeal"
by not ruling in his favor on federal constitutional matters (which are addressed herein below
within the context of other grounds), or by not ruling in his favor on a matter of Illinois state law,
which is not a cognizable ground for habeas corpus relief.  See Estelle v. McGuire, 502 U.S. 62,
67 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990) and Pulley v. Harris, 465 U.S. 37,
41 (1984), for the proposition that, "federal habeas corpus relief does not lie for errors of state
law"); see also Haas v. Abrahamson, 910 F.2d 384, 389 (7th Cir. 1990).

remaining three grounds, which respondent now concedes to be timely and not procedurally barred[2]. For the reasons set forth below, the court denies the petition.

## FACTS[3]

On April 29, 1991, Cesar Montalvo ("Montalvo"), a high-ranking member of the Latin Kings street gang, was shot while standing outside a house in Aurora, Illinois. Shortly after Montalvo was shot, a pipe bomb was thrown through the window of the house and exploded. Montalvo died from the gunshot injury, and petitioner and Allen Buckner ("Buckner") were prosecuted for his murder. The State's case against petitioner centered around the testimony of two witnesses, Daniel Contreras ("Contreras"), who testified pursuant to an agreement he had with the State of Illinois, and Patty Velasquez ("Velasquez"), Contreras' sometimes girlfriend. The testimony of Contreras and Velasquez implicated Buckner as the individual who shot Montalvo, and petitioner as the individual responsible for the pipe bomb explosion. Although not implicated as the shooter, petitioner was prosecuted for first degree murder under an accountability theory.

---

[2] Respondent argued in his initial answer that several of petitioner's grounds are procedurally barred because the appellate court found them barred by the doctrine of res judicata when considering petitioner's post-conviction petition (because the same court had earlier ruled against petitioner on these grounds on direct appeal). Respondent abandoned this argument in his second answer, however, apparently realizing that the appellate court's res judicata determination in the instant case is not a bar to this court's consideration of the claims. See Patrasso v. Nelson, 121 F.3d 297, 301 (7th Cir. 1997) (explaining that "[r]es judicata . . . is not a bar to consideration of claims in a federal habeas action," and clarifying that habeas "review is precluded only by procedural forfeitures, not res judicata concerns").

[3] This recitation of the facts is drawn from the Illinois Appellate Court's ruling on petitioner's direct appeal, People v. Simental, No. 2-92-1349 (2nd Dist. August 19, 1994) ("Simenthal I"), and its ruling on petitioner's post-conviction petition, People v. Simental, No. 2-97-0510 (2nd Dist. January 20, 1999) ("Simental II"), which are presumed to be correct pursuant to Abrams v. Barnett, 121 F.3d 1036, 1038 (7th Cir. 1997).

2

Prior to trial, the State brought a motion in limine seeking to prohibit petitioner from inquiring into investigations pending against Contreras at that time, or into any other matter beyond the terms of Contreras' written agreement with the State. The trial court ruled that petitioner's counsel could go into the names of the charges that were part of Contreras' agreement with the State, but not into the details of those charges. The trial court also ruled that petitioner's counsel could not inquire into any investigations pending against Contreras outside those set forth within the terms of his written agreement with the State.

At trial, Contreras testified that he had a party on April 29, 1991, attended by petitioner and others. According to Contreras, he was the second-highest ranking member of a more than 50-member gang in Aurora that was part of the Maniac Latin Disciples ("MLD") street gang. Contreras also testified that his home was used as the gang's headquarters in Aurora. Contreras described the MLD as "organized crime," and testified that its activities involved trafficking in drugs, guns, and bombs, and hurting individuals from other gangs. The top ranking member of the MLD was a man by the name of Todd Ochsenschlager ("Ochsenschlager"). Buckner, petitioner's codefendant in the Montalvo murder case, was third-in-command. Contreras testified that petitioner was also a member of the MLD.

According to Contreras, Ochsenschlager left the party and, upon return, advised Contreras and others present that while gone he had encountered members of the Latin Kings gang, and he had been "disrespected" by them. Buckner volunteered to avenge this incident and it was suggested that petitioner accompany him. Contreras testified that petitioner and Buckner were both wearing black pants, and Contreras gave them black hooded summer trench coats, hats, and

3

ski masks to wear as well. Contreras also claimed to have given a sawed-off shotgun, which he admitted buying, to Buckner, and a pipe bomb to petitioner.

Contreras asked Velasquez if he could use her car and she agreed, but she insisted upon riding along. At around 8:45 p.m., Contreras, Velasquez, Buckner, and petitioner all allegedly left the party in Velasquez's car, with Contreras driving, Velasquez in the passenger seat, and Buckner and petitioner in the back seat. According to Contreras, the weapons were concealed so that Velasquez would not be aware of what was going on. Contreras pulled into the neighborhood where Montalvo was and turned off the car's lights. Contreras left the motor running, however, to facilitate a quick getaway. At this point, Buckner and petitioner exited the car and ran down the street. Contreras explained at trial that he remained in the vehicle because he was "already above hurting people," apparently referring to his rank within the MLD. Contreras also testified that Velasquez asked him what was going on, and he told her that Buckner and petitioner were going to collect money that someone else owed him. She told him in response that she had seen Buckner with a gun and that she did not like guns in her car.

Contreras testified that after that he heard one gunshot, an explosion, and then three more gunshots. Buckner and petitioner came running back to the car, ducked down in the backseat, and then Contreras drove away, keeping the car lights off for some distance in an effort to avoid detection. According to Contreras, Buckner was carrying the shotgun when the two men came back to the car and, during their ride back to Contreras' home, Buckner told Contreras that he thought he had killed Montalvo and a second person.

When the group returned to the party, Contreras collected the gun and also the clothing he had given Buckner and petitioner. The party then broke up and Contreras hid the gun. Buckner

4

returned the following day with a newspaper clipping concerning the shooting and bragged that he had been right about killing Montalvo. Buckner told Contreras that the police had questioned him regarding the incident but had released him because of a lack of evidence. Contreras also testified that when petitioner stopped by the house around 1 p.m. that same day and said he was scared that the police would find out what had happened, Contraras told petitioner to remain silent.

During his testimony, Contreras admitted that he had been offered a deal in exchange for his testimony against petitioner. Contreras also admitted that he had initially lied to the police when questioned about the incident. After speaking with his attorney and while incarcerated on numerous charges unrelated to the Montalvo murder, Contreras contacted the State's Attorney's office and offered to tell them about Montalvo's murder in exchange for the dismissal of all of the charges pending against him. The State agreed to that deal, so long as Contreras told the truth and kept in regular contact with the State prior to the Montalvo murder trial. In addition to that agreement with the State, Contreras also had agreements with federal prosecutors to dismiss charges of illegal possession of explosives if Contreras helped agents from the Bureau of Alcohol, Tobacco, and Firearms recover the weapon used to kill Montalvo as well as several pipe bombs.

Contreras testified that he received cash payments totaling $800 from the Aurora police department and the State's Attorney's office to help him relocate to Texas after he had recovered the weapons. Contreras admitted that he broke off contact with the State and was eventually arrested and extradited back to Illinois. A new plea agreement was reached on May 6, 1992,

which provided, in addition to the terms of the first agreement, that Contreras would not be charged in the death of Montalvo.

At trial, Contreras was asked if he understood the State's obligation with respect to the plea agreement. He responded that he felt the State was obligated to "dismiss all–all charges that have brought up on me." Petitioner's counsel then attacked Contreras' credibility on the basis of his deal with the government. When asked, Contreras initially indicated that the other charges pending against him, aside from those connected to the Maltavo murder, were unlawful use of a weapon, aggravated battery, mob action, attempted robbery, and criminal damage to property. After affirming that this was a complete list of the charges against him, Contreras was "reminded" by petitioner's attorney, and he admitted, that he had additional charges of unlawful use of a weapon by a felon and unlawful possession of a weapon by a felon pending against him. Contreras also admitted that he had a previous felony conviction for possession of marijuana.

Velasquez's testimony generally corroborated Contreras' version of the relevant events on April 29, 1991, though she admitted that she had two beers to drink that night. Velasquez also testified about her relationship with Contreras. She stated that she met Contreras in 1986, and they had been involved off and on since. In approximately 1988, Velasquez gave birth to a stillborn child fathered by Contreras and, at the time of the trial in 1992, she was again pregnant with Contreras' child. Despite her connection to Contreras, Velasquez testified that she no longer had affection for him.

Petitioner's version of the events was different from those testified to by Contreras and Velasquez. During his testimony, petitioner denied being a member of the MLD, he denied attending a party at Contreras' house on April 29, 1991, and he denied any involvement in the

6

subsequent murder of Montalvo. Instead, petitioner testified that he had gone to a local Dairy Queen that night at about 7:30 p.m. with Imelda Ramirez ("Ramirez") and others to buy ice cream. After that, petitioner testified, he went to the house of his friend, Issac Villa, arriving at 8:00 p.m. and staying for approximately 25 minutes. According to petitioner, he returned home at about 8:45 p.m. and talked on the phone with Ramirez from around 9:00 p.m. to 9:30 p.m. Petitioner maintained that he and his sister then drove his sister's friend home at about 10:00 p.m. Petitioner presented several witnesses whose testimony corroborated his version of the events.

The jury found petitioner guilty of first degree murder for the death of Montalvo. Prior to sentencing, petitioner filed several post-trial motions, including one that sought a new trial because the State had failed to disclose that Contreras believed that his plea agreement with the State included an incident where he brutally beat a man by the name of Rafeal Martinez ("the Martinez beating"). The Martinez beating allegedly occurred two months prior to Montalvo's murder. In ruling on this motion, the trial court found that apparently there had been a conversation between Contreras and Detective Anderson of the Aurora police department, and Contreras had come away from that conversation feeling that his deal with the State encompassed the Martinez beating. The trial court also found that when the defense was given the details about the plea agreement made with Contreras prior to trial, the fact that there was possibly a deal involving the Martinez beating was not contained therein. The trial court concluded, however, that a new trial was not justified in petitioner's case because the State demonstrated due diligence by showing that the Martinez beating deal was not something the prosecutor could have learned about before trial and because disclosing this additional matter, in the context of all the

7

other deals which had been disclosed between Contreras and the State, was "merely cumulative" evidence and could not have affected the outcome of the trial. The Illinois Appellate Court affirmed that decision.

## HABEAS CORPUS STANDARD

Relief may be awarded to petitioner only if the state court adjudication of his claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C §2254(d).

## DISCUSSION

The three grounds raised by petitioner and his counsel are: (1) that the State's suppression of Contreras' understanding that his deal encompassed the Martinez beating violated petitioner's due process rights; (2) that the State's failure to correct false testimony given by Contreras violated petitioner's due process rights; and (3) that the trial court's grant of the State's motion in limine, barring petitioner's counsel from impeaching Contreras with the Martinez beating, violated petitioner's Sixth Amendment right to confront the witnesses against him.

## I. The State's Suppression of Contreras' Deal Regarding the Martinez Beating

Petitioner's first ground for habeas relief argues that the State suppressed Contreras' deal regarding the Martinez beating in violation of Brady v. Maryland, 373 U.S. 83 (1963), thereby depriving petitioner of a fair trial. As explained by the Seventh Circuit in Boss v. Pierce, 263 F.3d 734 739-40 (7th Cir. 2001), Brady and its progeny establish an "affirmative duty to disclose evidence that is both favorable to the defense and material to either guilt or punishment." "To

8

establish a <u>Brady</u> violation, [petitioner] must demonstrate that (1) the prosecution suppressed

evidence, (2) the evidence was favorable to [petitioner's defense], and (3) the evidence was

material to an issue at trial." <u>Id</u> at 740. Of these three, the suppression and materiality elements

are contested by respondent.[4]

### A. Suppression

"Evidence is suppressed for <u>Brady</u> purposes only if (1) the prosecution failed to disclose

evidence that it or law enforcement was aware of before it was too late for [petitioner] to make

use of the evidence, and (2) the evidence was not otherwise available to [petitioner] through the

exercise of due diligence." <u>Id</u>. In the instant case, the suppression debate centers on whether the

State or the law enforcement officers involved in the case were aware that Contreras believed his

deal encompassed the Martinez beating.

In addressing this issue, the Illinois Appellate Court in <u>Simental I</u> noted the standards set

forth above and added that, "The prosecution's obligation to disclose information under <u>Brady</u>

and <u>Giglio</u>, however, is limited to information known to the prosecution." <u>Simental I</u> at 10

(citing <u>United States v. Young</u>, 20 F.3d 758, 764 (7th Cir. 1994)). The <u>Simental I</u> court also

explained that, "The exception to this general principle is that 'a prosecutor's office cannot get

around <u>Brady</u> by keeping itself in ignorance, or compartmentalizing information about different

aspects of the case.'" <u>Simental II</u> at 10-11 (quoting <u>Young</u>, 20 F.3d at 764). The appellate court

reasoned:

---

[4]  Respondent correctly does not challenge petitioner's assertion that Contreras' deal
regarding the brutal beating was favorable to the defense since it could have been used to
impeach Contreras, the State's star witness, at trial. <u>See</u> <u>Giglio v. United States</u>, 405 U.S. 150,
153 (1972).

We find the facts of Young to be closely analogous to those in the present case. In Young, a defendant facing drug charges was convicted with the aid of testimony from a coconspirator who had obtained a plea agreement in exchange for his testimony. Prior to trial, the prosecution searched the witness'[s] criminal background and disclosed the information which had been uncovered. This search included asking the witness whether he had any prior criminal convictions. Subsequent to the trial, the United States Probation Office discovered that the witness had a substantial criminal record from the State of Mississippi. This criminal record was not disclosed to [petitioner] prior to trial. The court concluded, however, that no Brady violation had occurred because (1) there was no evidence to suggest that the government was aware of the witness'[s] Mississippi record, and (2) the government had adequately fulfilled its investigatory and disclosure responsibilities. See Young, [20 F.3d at 764-65]. In the present case, the agreement made with Contreras concerning the additional beating incident was not known to the prosecutor. In fact, the record suggests that although Contreras was left with the impression that he had a deal regarding the beating incident, the detective who spoke with him may not have intended to offer such a deal. Rather [Contreras] was left with the impression that he would not be prosecuted for any charges arising from the beating incident if he complied with the terms of the written plea agreement, and the State ultimately honored this impression. Also, we note that the prosecution otherwise diligently and meticulously detailed the agreement with Contreras. Given the record presented, we must reach the same determination as the court in Young; the State did not knowingly suppress information material to the defense.

Simental II at 11-12.

Petitioner takes issue with the above reasoning, arguing that, "The appellate court . . . rebuffed [petitioner's] request for relief, inter alia, on grounds that the trial prosecutor had exercised due diligence," which petitioner asserts is an "unreasonable application of United States Supreme Court law because the good faith of the prosecutor remains immaterial to a Brady claim." This argument misses the mark. The appellate court's decision, and in particular its reliance on Young, indicate that the purpose of noting that the State had otherwise "diligently and meticulously detailed the agreement with Contreras," addressed the concern voiced by the Seventh, Third and Fifth Circuits that, "'a prosecutor's office cannot get around Brady by

10

keeping itself in ignorance or compartmentalizing information about different aspects of the case.'" Young, 20 F.3d at 764 (quoting Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984), citing United States v. Perdomo, 929 F.2d 967 (3rd Cir. 1991), and United States v. Auten, 632 F.2d 478 (5th Cir. 1980), and noting that the petitioner relied upon these cases heavily). Moreover, the appellate court's comments about the State's conduct were secondary to its finding that the that State did not knowingly suppress information material to the defense. Thus, the court disagrees with petitioner that the appellate court unreasonably applied United States Supreme Court law.

Petitioner next argues that, "the Illinois Appellate Court misconstrued United States Supreme Court law" by finding, in his words, that, "while Detective Anderson was a participant in the conversation that led Contreras to believe that immunity had been conferred, the trial prosecutor lacked the same understanding." Petitioner cites Kyles v. Whitley, 514 U.S. 419, 437 (1995), and Strickler v. Greene, 527 U.S. 263, 280-81 (1999), in support of this argument, concluding that, "in recent years, the United States Supreme Court has twice stated that information that must be disclosed under Brady includes information 'known only to police investigators and not to the prosecutor.'"[5] This argument is flawed, however, because it ignores the fact that the appellate court did take Detective Anderson's knowledge into account.

---

[5] Kyles and Strickler were both decided after Simental I, rendering meaningless petitioner's argument that the Simental I court misconstrued the holdings of those cases. Even so, because the court in Simental II held that the doctrine of res judicata barred reconsideration of petitioner's argument, and because that decision came after Kyles (which noted that the government's discretion in deciding what to disclose under Brady necessarily includes a "duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police"), the court addresses petitioner's argument. Kyles, 514 U.S. at 437.

After noting that "the agreement made with Contreras concerning the additional beating incident was not known to the prosecutor," the appellate court added that, "In fact, the record suggests that although Contreras was left with the impression that he had a deal regarding the [Martinez beating], the detective who spoke with him may not have intended to offer such a deal." Petitioner takes issue with this finding, too, noting that "Detective Anderson . . . participated in the conversation from which Contreras gathered that he had been given immunity for the Martinez beating," and then concluding that, "As Giglio, Kyles, and Strickler make clear, information within Detective Anderson's knowledge was within the purview of the information required to be disclosed under Brady." Petitioner's conclusion, though true, does not necessarily follow from his premise. That is, the mere fact that Detective Anderson participated in the conversation that led Contreras to believe that the Martinez beating was included in his deal with the State, does not mean that Detective Anderson knew that Contreras left the conversation with that impression. Petitioner argues in this regard that, "The appellate court did not definitively find that Detective Anderson did not know of the deal." That is true, of course, but the appellate court also did not definitively find that Detective Anderson did know of the deal, and without reaching that conclusion, the appellate court could not find that a Brady violation had occurred.

Petitioner finally argues in his reply brief that, "The proof that Contreras was in fact given immunity for the Martinez beating is in the pudding: the State did not prosecute Contreras for the incident." That is true too, according to the record, but the fact that, after petitioner's trial, the State decided not to prosecute Contreras for the Martinez beating does not prove that, prior to petitioner's trial, the State knew that Contreras understood that to be part of his deal. Thus, for the reasons set forth above, the court finds the appellate court's conclusion that the State did not

knowingly suppress information under <u>Brady</u> to be a reasonable application of Supreme Court

precedent under §2254(d).

### B. Materiality

Even if petitioner could establish that the State suppressed evidence, he would still

have to show that the evidence suppressed was material in the context of his trial. Suppressed

evidence is material under <u>Brady</u> "'if there is a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different.'" <u>Kyles</u>, 514

U.S. at 433-34 (quoting <u>United States v. Bagley</u>, 473 U.S. 667 (1985)). "Such probability exists

where the suppressed evidence, or evidence that is derived directly from the suppressed evidence,

undermines confidence in the outcome reached. <u>Boss</u>, 263 F.3d at 744.

With respect to the materiality requirement, the <u>Simental I</u> court reasoned:

> Even were we to conclude . . . that the prosecution had suppressed the evidence in
> question, no new trial would be warranted in this case because we determine that
> the omitted evidence, which was merely cumulative, was not material in the
> context of the totality of the impeachment evidence presented at trial. As was
> pointed out by the trial court, the effect of disclosing the additional plea
> agreement to the jury would have been merely cumulative. Given the number of
> charges against Contreras which were being dismissed as a result of his plea
> agreement, in particular the murder and bombing involved in the present case, and
> Contreras' admitted involvement in a variety of serious criminal activities, we
> determine that the disclosure of this one additional agreement would have been of
> no importance to the ultimate outcome.

<u>Simental I</u> at 12-13.

Petitioner argues that this finding was erroneous because Contreras' immunity from

prosecution for the Martinez beating was "more than 'just another immunity agreement.'"

According to petitioner, "Contreras' credibility was central to the State's case" against petitioner.

Petitioner also argues: "If Martinez [had] died [from the beating], Contreras[, if convicted for

13

the beating,] would have been eligible for the death penalty. What greater incentive to lie than to save one's life, or avoid prosecution for an extremely serious offense?" Petitioner also notes that, "some of the offenses for which Contreras received immunity were relatively minor (and some even misdemeanors) compared to the brutal beating of Martinez."

These points are well-taken but ultimately unpersuasive. First, while it is true that Contreras was the State's star witness, it is also clear that the evidence at trial (all of which Contreras admitted to be true) established his serious personal character weaknesses. That evidence included: Contreras was the second-highest ranking member of the MLD gang in Aurora, an "organized crime" group involved in trafficking in drugs, guns, and bombs, and hurting individuals from other gangs; Contreras had previously been convicted for possession of marijuana; Contreras provided the sawed-off shotgun and the pipe bomb used on April 29, 1991, and he drove the assailants to and from the scene of Montalvo's murder in such a way as to avoid detection; Contreras allowed his sometimes-girlfriend to ride in the car that night, and he lied to her when she asked what was going on; when first questioned about the Montalvo murder, Contreras lied to the authorities; Contreras offered to make a deal with the State only after he was arrested and taken to jail on other charges; Contreras was given cash payments totaling $800 by the Aurora Police Department and the State's Attorney's Office to help in his relocation; after relocating, Contreras broke his promise to keep in touch with the State; after the State charged Contreras with the Montalvo murder, he brokered another deal that called for his testimony against Buckner and petitioner in exchange for the State dropping the Montalvo murder charge, in additional to his unlawful use of a weapon charge, his aggravated battery charge, his mob action charge, his attempted robbery charge, his criminal damage to property charge, his unlawful

14

use of a weapon by a felon charge, and also his unlawful possession of a weapon by a felon charge. Thus, while Contreras' testimony was central to the State's case, based on all of the above, the court disagrees that the jury's assessment of Contreras' credibility would have suffered materially more damage had it been demonstrated that he understood his deal to also include the Martinez beating.

Petitioner's argument about Martinez's death possibly resulting in Contreras being sentenced to death is too tenuous to be persuasive. First, at the time of petitioner's trial, Contreras had not even been charged with the Martinez beating, much less convicted. Further, there is no evidence suggesting that Martinez's death was a possibility by the time of petitioner's trial, much less imminent. Further, even if petitioner is right that the charges stemming from the Martinez beating would have been "extremely serious," the court disagrees with petitioner that they were any more serious than the murder, unlawful use of a weapon (including the shotgun and the pipe bomb), aggravated battery, and attempted robbery charges that the jury knew to be part of Contreras' deal with the State.

Petitioner's next argument is the that Martinez beating deal would have been compelling for a reason other than just demonstrating that Contreras, the State's star witness, faced serious charges and thus had a motive to lie on the stand. According to petitioner, if the Martinez beating deal had been allowed in evidence, it would have also demonstrated that Contreras had lied on the stand. "Little did the jury know" petitioner argues, " that Contreras, who boasted he was 'already above hurting people' had beaten [Martinez] comatose with a baseball bat approximately two months before Montalvo's death."

15

But the appellate court addressed this argument in deciding <u>Simental I</u>, explaining:

> [Petitioner's] argument that the evidence could have been used to demonstrate perjury on Contreras' part is similarly flawed. The record reveals that when Contreras summed up the charges pending against him, as well as the deals he had been given, he had to be "reminded" by [petitioner's trial counsel] not once, but twice, that he had failed to include all of the pending charges. Thus, all defense counsel would have gained [by impeaching Contreras with the fact that he was not in fact "above" violence] was a third opportunity to demonstrate Contreras' selective memory to the jury. The cumulative nature of such impeachment does not demonstrate the requisite showing of materiality and would not warrant a new trial given the volume of impeachment evidence already admitted on this subject.

<u>Simental I</u> at 13.

The above reasoning of the appellate court[6] is clearly reasonable. See <u>Lindh v. Murphy</u>, 96 F.3d 856, 871 (7th Cir. 1996), <u>rev'd on other grounds</u>, 521 U.S. 320 (1997) ("[W]hen the constitutional question is a matter of degree, rather than of concrete entitlements, a 'reasonable' decision by the state court must be honored. By posing the question whether the state court's treatment was 'unreasonable,' §§2254(d)(1) requires federal courts to take into account the care with which the state court considered the subject.").

The court also notes two other apparent weaknesses in petitioner's argument. The first is that it is not absolutely clear that Contreras' testimony <u>was</u> false and therefore impeaching. Contreras testified that he did not get out of the car and approach Montalvo and the other Latin King gang members on April 29, 1991, because he was "already above hurting people" at that time. Petitioner identifies that testimony as false based on the fact that Contreras beat Martinez. But the Martinez beating occurred two months prior to the Montalvo murder. Thus, it is possible

---

[6] The appellate court further observed in <u>dicta</u> that, "[petitioner] admit[ted] in his appellate brief that his trial counsel was aware of the beating incident at the time of the trial," implying that petitioner's counsel could have somehow made use of that information at trial. This court agrees with petitioner that because it would have been impossible for his counsel to make use of the Martinez beating given the trial judge's ruling on the State's motion <u>in limine</u>, the appellate court's observation is irrelevant.

(or at least it is not impossible) that Contreras was telling the truth when he claimed to be "already above hurting people" at the time of the Montalvo murder, which lessens the value of this evidence. The second weakness is that petitioner appears to have had another means at his disposal of impeaching this same testimony by Contreras: the aggravated battery charge that was known to the jury as being part of Contreras' deal with the State. Accordingly, even without being able to cross-examine Contreras about the Martinez beating, petitioner's counsel would have been able to cast doubt on Contreras' claim that he was "above hurting people" with the fact that one of the charges against him at the time of trial was for doing just that.[7]

For all of these reasons, this court agrees with the conclusion of the Simental I court that the fact that Contreras understood his deal with the government to include the Martinez beating was cumulative when considered in the context of the totality of the impeachment evidence presented against Contreras at trial. Thus, even if petitioner were able to show that suppression under Brady had occurred, he still would not be able to show that the evidence suppressed was material, which likewise dooms his Brady claim. The court therefore denies the petition for a writ of habeas corpus on this ground.

## II. The State's Failure to Correct Allegedly False Testimony given by Contreras

Petitioner next seeks habeas corpus relief based on the State's failure to correct Contreras' testimony that he did not participate first-hand in the Montalvo murder because he was "already above hurting people." According to petitioner, the State had a duty to correct this testimony because, based on Contreras' beating of Martinez, the State knew it to be false.

By now it is well established that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."

---

[7] The record does not reflect when the aggravated battery with which Contreras was charged occurred. If that charge was for conduct predating the Montalvo murder, this potential means of impeachment would be no more persuasive than the Martinez beating.

<u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." <u>Id</u>. Further, as the <u>Napue</u> Court explained, this principle "does not cease to apply merely because the false testimony goes only to the credibility of the witness" because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." <u>Id</u>. Likewise, "the fact that the jury was appraised of other grounds for believing that the witness [at issue] . . . may have had an interest in testifying against petitioner" does not turn "what was otherwise a tainted trial into a fair one." <u>Id</u>. at 270. Even so, the court is obligated to rule in favor of petitioner only if it finds that the "false testimony could . . . in any reasonable likelihood[,] have affected the judgment of the jury.'" <u>United States v. Bagley</u>, 473 U.S. 667, 677 (1985) (quoting <u>Giglio</u>, 405 U.S. at 154).

The <u>Simental I</u> court found this argument to be encompassed within petitioner's <u>Brady</u> claim. This court agrees. As explained above, it is not clear that Contreras' testimony about being "above hurting people already" was false at all. Further, even if it was false, petitioner appears to have had other means with which to impeach Contreras with respect to this testimony. And finally, as set forth in detail above, Contreras gave the jury many reasons to disbelieve his testimony and his stated reason for not participating first-hand in the Montalvo murder, and yet the jury still found petitioner guilty. For these reasons, the court concludes that petitioner has not shown that his conviction was obtained through the use of false evidence, or that there is a reasonable likelihood that, even if shown to be false, any correction of Contreras' testimony by the State would have affected the judgment of the jury. Thus, the petition for a writ of habeas corpus is denied on petitioner's second ground.

### III. The Trial Court's Grant of the State's Motion in Limine

Petitioner next claims that the trial court's ruling barring petitioner's counsel from cross-examining Contreras regarding uncharged prior bad acts which were not included in his deal with the State violated petitioner's Sixth Amendment right to confront Contreras. Along the same vein as petitioner's second claim, the Simental II court found this claim to be petitioner's Brady claim disguised as a separate claim under the Sixth Amendment. This court agrees.[8] While it is true that "[u]nreasonably limiting the cross-examination of a prosecution witness infringes the constitutional right of confrontation," Redmond v. Kingston, 240 F.3d 590, 590 (7th Cir. 2001), the Brady analysis above indicates that the trial court's ruling on the State's motion in limine was not unreasonable.

The trial court's ruling prohibited petitioner from going into prior bad acts of Contreras aside from those that were a part of his deal with the State. As noted above, there is no evidence that, at the time of the trial court's ruling, anyone but Contreras believed that the Martinez beating was part of Contreras' deal with the State. Thus, at that point, the Martinez beating was nothing more than one of perhaps many uncharged prior bad acts of Contreras which were unrelated to the Montalvo murder. As such, and because Contreras' alleged beating of Martinez was not probative of Contreras' character for truthfulness, the probative value of the beating itself was suspect. Thus, the court finds no error of constitutional magnitude in the trial court's grant of the State's motion in limine prohibiting petitioner from inquiring into the Martinez beating.

---

[8] Perhaps proving the point, petitioner argues that, "the failure to disclose the immunity agreement relative to the Martinez beating impeded [petitioner's] ability to fully expose Contreras' bias and motive to testify falsely" on cross-examination.

The court does agree with petitioner that Contreras' commission of the Martinez beating was arguably[9] impeaching of Contreras' testimony that he did not participate in the Montalvo shooting because he was "already above hurting people" at the time. Had that argument been made to the trial court following the offending testimony by Contreras, reconsideration of the ruling on the State's motion in limine may have been in order. But that argument was not made to the trial court, so petitioner's request for habeas corpus relief necessarily fails on this ground. Petitioner cannot show that, under the circumstances in which it was made, the trial court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C §2254(d). Thus, the court denies petitioner's request for a writ of habeas corpus on his third and final ground.

## CONCLUSION

For the reasons set forth above, the court denies the petition for a writ of habeas corpus.

**ENTER:** **June 26, 2002**

_(signature)_

**Robert W. Gettleman**
**United States District Judge**

---

[9] As explained above, it is possible that Contreras' testimony was not false; his rank in the gang and/or his involvement in the gang's violent activities may have changed in the two months between the Martinez beating and the Montalvo murder.